The suit is to recover on a beneficiary certificate for $1,000, issued by the Sovereign Camp of the Woodmen of the World (the name of which was subsequently changed to the Woodmen of the World Life Insurance Society, hereafter called the Society) on the life of Glavin Allen Lear, son of the plaintiff. The certificate was issued on January 25, 1930, and the insured died on March 9, 1938. The Society refuses payment on the ground that the certificate had become null and void at the time of the death of the insured for non-payment of the premiums necessary to keep the certificate in force. *West Page 45 
The case was first submitted on the face of the pleadings, and a judgment was rendered in favor of the plaintiff against the Society for $923.88, the face of the certificate, less a loan thereon, with six per cent per annum on the amount from May 9, 1938 until paid. An appeal was taken to this court by the Society and the judgment was reversed and the case remanded for further proceedings. The principal issues in the case are stated in our former opinion. See 191 So. 739.
On the remand of the case, evidence was introduced and the case submitted to the trial judge, who again rendered a judgment in favor of the plaintiff and against the Society in the same amount as in his former judgment. The Society has again appealed.
The certificate states on its face that it is a "Twenty-Payment Certificate" and recites that upon satisfactory proof of the death of said Glavin Allen Lear, the Society will pay to the plaintiff as beneficiary the sum of one thousand dollars. The certificate contains the following paragraph on the first page thereof:
"This certificate is issued and accepted with the express agreement that the provisions and benefits contained on this and the three succeeding pages hereof, and in any authenticated riders attached hereto, form a part of this contract as fully as if recited over the signatures hereto affixed."
The premium necessary to keep the certificate in force is fixed at $2.09 per month, or $24.13 per annum. On page 2 of the certificate is the following "Automatic Premium Loan" clause:
"After thirty-six monthly payments on this certificate shall have been paid, if any subsequent monthly payment be not paid on or before its due date, and if the member has not, prior to such due date, selected one of the options available under the non-forfeiture provisions of this certificate, the Association will, without any action on the part of the member, advance as a loan to the said member the amount of the monthly payments required to maintain this certificate in force from month to month until such time as the accumulated loans, together with compound interest thereon at the rate of five per cent per annum, and any other indebtedness hereon to the Association, equal the cash value hereof at the date of default in the payment of the monthly payments. When the said cash value has been consumed in loans advanced and interest thereon, then this certificate shall become null and void; * * *"
The last monthly premium paid by the insured was for the month of January, 1937, and the certificate would have become null and void on February 1st but for the above quoted automatic loan agreement by which the Society had agreed to keep the certificate in force so long as the cash reserve would pay the monthly premiums. On the third page of the certificate there is attached a printed slip containing a table of cash and loan values and paid up and extended insurance. At the bottom of this slip are the printed words, "Twenty-Payment Life, $1000 — age 16."
So far we have mentioned some of the principal provisions contained in the certificate apparently used by the Society for regular twenty pay life insurance and which is simple and easily understood. But to this certificate are attached two riders which bring about this law suit, one of these riders providing for total disability benefits and waiver of premiums, and the other providing for double indemnity in case of death by accidental means. The first of these riders (which we will call the disability rider) provides that if the member before reaching the age of 60 becomes totally and permanently disabled while the certificate is in full force and effect and "no payment as required from the member is in default" the Society agreed to pay him certain monthly benefits and waive the payment of premiums. These benefits do not apply in case of paid up or extended insurance granted under the non-forfeiture provisions of the certificate and any disability benefit reserve shall not be included in computing any such insurance. The annual premium for these disability benefits is $2.37, which amount is included in the annual premium mentioned on the face of the certificate, but the member could terminate these benefits at any time by giving notice in which event the annual premium on the certificate would be reduced accordingly. In no event could these benefits continue after the member reached 60 years of age.
The other rider provides for the payment of double the amount of the certificate in case of accidental death of the member, and the rider provides on its face that this benefit shall automatically terminate upon the default in the payment of any premium, when the member reaches 60 years of age, or when the premium paying period of the certificate has been completed (in this case *West Page 46 
after 20 years at which time Lear would have been only 36 years of age); likewise the member could terminate this benefit at any time by giving notice and in that event the amount of the extra premium of $1.75 per annum charged for this benefit would be deducted from the total premium mentioned in the certificate.
On February 1, 1937, the date on which the member was in default, the cash reserve on the certificate as shown on the printed sheet designated as twenty-pay life above mentioned was $77.80. The Society took this reserve and in arriving at the balance to be used in paying the premiums deducted therefrom a loan against the certificate with interest thereon to February 1, 1937, the date of the default, which amounted to $50.79, thus leaving the sum of $27.01 to be used in paying premiums on the certificate under the automatic loan agreement. This balance was applied by the Society to pay the monthly premiums of $2.09, which included the premiums to keep in effect the two riders for disability and double indemnity, for eleven months, that is for February through December, 1937, inclusive, plus interest on the loan and the advances for the eleven months premiums, making a total of $25.83. Thus on January 1, 1938, according to the Society, the balance of $27.01 was absorbed with the exception of $1.18 which was not enough to pay a monthly premium, and therefore the certificate lapsed and became null and void on February 1, 1938, more than a month before the insured died.
Plaintiff contends that the Society had no right to use the reserve to pay the premiums to keep the two riders in effect as they terminated when the member failed to pay the premiums thereon as provided in the riders themselves; that the automatic loan agreement only contemplated keeping the term insurance in force and not the separate and divisible benefits provided for in the two riders. It is admitted that the monthly payment of $2.09 included $1.73 for the life certificate, 21 cents for the disability benefits and 15 cents for double indemnity from which it is obvious that, if the Society only had a right to use the balance of the reserve to keep the life certificate in force, the amount would have been sufficient to pay the premiums for this purpose beyond the date of the member's death.
This suit arises out of two different interpretations placed on the automatic loan agreement and the meaning of the clauses above referred to in the two riders. Our study of the question leads us to the conclusion that the construction placed upon these provisions by the plaintiff and that placed upon them by the Society are both reasonable and plausible. We will first give our reasons for believing that the interpretation placed upon these provisions by the Society is reasonable and plausible and then follow these reasons by giving those which support the interpretation placed upon these provisions by the plaintiff.
The certificate, as well as the two riders attached thereto, states that these riders form a part of the contract. The monthly premium necessary to keep the certificate in force includes the life insurance of $1,000 and the disability benefits and double indemnity provided for in the riders. The Society obligated itself under the automatic premium loan agreement to advance for the benefit of the member a sufficient amount out of the reserve to keep the certificate in force until this reserve was exhausted. It is reasonable to assume that when the Society agreed to advance the monthly payments from this reserve to keep the certificate in force after default by the member, the certificate included the benefits provided for in the two riders attached to the certificate and made part thereof; that the Society would not have discharged its obligation to the member under this premium loan agreement had it not also kept these benefits provided for in the riders in full force and effect.
Among the decisions cited by the Society in support of its interpretation placed upon these provisions in the certificate and riders attached thereto are the following: Croslen v. Grand Lodge, 29 Cal.App.2d 710, 85 P.2d 485; Hay v. Connecticut Mutual Life Insurance Co., 176 Tenn. 48, 138 S.W.2d 413, 128 A.L.R. 548; Shamblin v. Southland Life Insurance Co., Tex. Civ. App.,145 S.W.2d 272.
In our opinion these cases are not similar to the situation presented in the present case. In the Croslen case, the by-laws of the Order provided that when a member holding a certificate defaulted in his payments, the Order would automatically use the reserve due the member to pay the premiums in order to keep the life insurance, disability benefits and double indemnity insurance in effect so long as the reserve lasted. The certificate issued to Croslen contained a provision that the member could at any time terminate the disability *West Page 47 
benefits by ceasing to pay rates and assessments therefor without affecting the beneficiary certificate. It was contended by plaintiff in that case that the Order had no right to pay the premiums necessary to keep the disability benefits in effect out of the reserve after default was made by the member, in which case the reserve would have been sufficient to keep the life certificate in effect to the date of the member's death. The court correctly held that, under the bylaws of the Order, it was required to use the reserve in paying the premiums on the disability insurance as well as the life insurance features of the certificate. There is no claim made here that the Constitution, Laws and By-Laws of the defendant Society contained any such provision requiring it to pay the premiums for disability and double indemnity insurance out of the reserve.
In the Hay case, the policy contained a rider whereby the company agreed to pay double indemnity in case of accidental death whilethe policy was in full force and effect, and it was further provided that the amount payable as double indemnity under the rider was to be added to and payable with the proceeds of the policy. There was a clause in the policy for extended insurance from the reserve, and the court held that, as the company kept the policy in force after default, this had the effect of keeping the double indemnity rider in effect as it provided for double indemnity so long as the policy was in force; that if the company had intended to exclude the double indemnity while the policy was running on the extended insurance, it should have said so. It can equally be said in the present case that if the Society intended to keep these two riders in force out of the reserve, it could have inserted a clause in them to that effect.
In the case of Shamblin, the provisions in the policy and riders were not similar to the provisions in the certificate and riders in the present case. For instance, the disability rider provided that the benefits therein contained should not be payable if at the date of the disability the policy should be in force under any non-forfeiture provision (except automatic premium loan provision, if any, and there was such a provision). Moreover, it was shown in that case that the company notified the insured periodically as these payments were made out of the reserve, and no protest was made thereto by him.
Passing now to the reasons supporting plaintiff's interpretation of the contract, we observe first that, while neither the certificate nor riders so state, nor does the evidence show, it is apparent that in computing the reserve set forth on the sheet attached to the life certificate, the additional premiums on account of the two riders were not then taken into consideration. We say this for several reasons: The printed table itself indicates it is for a twenty payment life policy of one thousand dollars at age 16. The benefits covered in these riders may terminate under several conditions and yet not affect the life policy, and apparently would not affect the cash reserve of the policy. This is obvious from the fact that the member could terminate these riders any time he saw fit and not affect his life insurance or the cash reserve, and, indeed, these riders would have lapsed themselves after this member had paid twenty payments and the certificate had thus become a paid up life certificate for its face amount. Assuredly it could not be said that the premiums went to increase the cash reserve under this situation. In fact, it is obvious that the amount of extra premiums paid for these extra benefits are intended to cover the extra risk taken by the Society in giving this extra protection.
While the riders are a part of the entire contract, the contract is composed of three separate and divisible obligations, each based on a separate and distinct premium charge. Before the riders were attached (and they were attached when the certificate was issued), the life certificate with the automatic premium loan clause and the cash reserve as fixed in the attached table was a complete and distinct contract in itself. The riders are each supplementary and separate agreements attached to and made part of the life certificate. Under Section 63 of the Constitution, Laws and By-Laws of the Society, a beneficiary certificate will automatically lapse if the member fails to pay his dues, unless otherwise provided in the certificate. The fact that this section refers to life certificates, and not to supplementary agreements, is indicated from the fact that in case of the lapse of a beneficiary certificate for non-payment of dues the amount already paid is to be retained by the Society to pay his proportionate cost of doing business and for the cost of the protection furnished him on his life before his default. *West Page 48 
So it appears reasonable to conclude that the automatic premium loan clause has reference to keeping in force the beneficiary certificate providing life insurance by using the reserve accumulated from premiums paid for this insurance. We must assume that every word and sentence placed in these riders were intended to have some effect. That being true, why did the Society state in one rider that the disability benefits would be made on condition that no payment as required from the member was in default, and in the other that the double indemnity provision would automatically terminate upon default in the payment of any premium? If it was intended that these benefits were to be continued after the member defaulted in his payments by using part of the reserve on the certificate, it seems that a proper clause to that effect would have been inserted in each rider.
The Society wrote the certificate and the attached riders, and whatever uncertainty or ambiguity appears therein must be construed against it. The Society had the duty of making its agreements reasonably clear and free from two equally reasonable constructions. In writing its agreement to use the reserve belonging to the member to keep the certificate in force until the reserve was exhausted after the member defaulted, it would have been a very simple matter to add to its agreement to use the reserve to keep the certificate in force an additional clause which would include all the benefits contained in riders attached to the certificate. Or to have inserted in the riders provisions to the effect that they would be extended by using the reserve on the certificate in case the member defaulted in his payments.
Where the terms of an insurance policy are capable of two interpretations, equally reasonable, the construction which will give effect to the policy rather than cause its forfeiture will be adopted. Corporation of Roman Catholic Church v. Royal Insurance Co., Ltd., 158 La. 601, 104 So. 383. The least that can be said of the construction placed on the certificate and attached riders in this case by the plaintiff to the effect that the Society was under the obligation of using the cash reserve to keep the life insurance in force is equally as reasonable and plausible as the contention of the Society that it had a right to use this reserve to keep the benefits provided for in the riders in force as well as the life insurance feature. Under this situation, we consider it our duty to follow the principle of law above stated and adopt that construction which will give effect to the contract rather than nullify it.
The trial court allowed six per cent per annum on the amount due under the policy. Act 17 of 1920 requires all life insurance companies doing business in this state to pay all death claims within sixty days from receipt of proof of death and in case they fail to do so without just cause, the policy shall bear six per cent per annum interest from the date of receipt of proof of death until paid. The defendant Society is not a life insurance company but a fraternal benefit society authorized to do business in this state under the provisions of Act 256 of 1912, Section 4 of which exempts the Society from laws applicable to insurance companies. The interest rate should be five instead of six per cent per annum.
For the reasons assigned, it is ordered that the judgment appealed from be and the same is hereby amended so as to change the rate of interest on the amount of the judgment from six per cent per annum to five per cent per annum, and as thus amended, the judgment is affirmed; appellee to pay the cost of the appeal, and the appellant to pay all other cost.